# In the United States Court of Federal Claims

No. 05-381L

(Filed: November 16, 2006)

| | |
|---|---|
| * * * * * * * * * * * * * * * * * * * * ) <br> ) <br> ARKANSAS GAME AND FISH ) <br> COMMISSION, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> UNITED STATES, ) <br> ) <br> Defendant. ) <br> ) <br> ) <br> * * * * * * * * * * * * * * * * * * * * | Motion to compel; RCFC 37(a); entry upon land for testing and sampling; fact discovery; piezometers; RCFC 34(a)(2); scope of discovery; protective conditions for entry upon land; RCFC 26(b) |

    Julie D. Greathouse, Perkins & Trotter, PLLC, Little Rock, Arkansas, for plaintiff. Of counsel were G. Alan Perkins, Perkins & Trotter, PLLC, Little Rock, Arkansas, and James F. Goodhart, Arkansas Game & Fish Commission, Little Rock, Arkansas.

    HelenAnne Listerman, Trial Attorney, Natural Resources Section, Environment and Natural Resources Division, United States Department of Justice, Washington, D.C., for defendant. With her on the briefs was Assistant Attorney General Sue Ellen Wooldridge, Washington, D.C. Of counsel was Jennifer Dalton, United States Army Corps of Engineers, Little Rock, Arkansas.

**OPINION**

LETTOW, Judge.

    This case involves a claim by the Arkansas Game & Fish Commission ("Arkansas Game") against the United States for a taking of Arkansas Game's property without just compensation in contravention of the Fifth Amendment of the United States Constitution. Arkansas Game avers that the United States Army Corps of Engineers ("Corps") deviated from a

water control plan for Clearwater Lake, a reservoir the Corps operates to control flooding along the Black River in southeastern Missouri and northeastern Arkansas. Specifically, Arkansas Game alleges that the Corps made unauthorized releases of water from the lake, resulting in damage to bottomland hardwood timber and other bottomland resources at the Dave Donaldson Black River Wildlife Management Area ("Black River Management Area"). In its original complaint, Arkansas Game sought $8,000,000 in damages and an injunction preventing the Corps from deviating from the water control plan.

Previously, the government sought a partial dismissal of the complaint insofar as injunctive relief was concerned, and Arkansas Game subsequently moved for a partial voluntary dismissal of the complaint in that regard. After dismissing the part of the complaint relating to injunctive relief, the court adopted a plan and schedule for discovery. Taking into account two extensions, fact discovery closed on October 2, 2006. Thereafter, on October 17, 2006, the government filed a motion to compel Arkansas Game to permit the government's representatives to install seven to ten piezometers in the Black River Management Area for the purpose of testing and measuring water levels during winter flooding that is used to enhance waterfowl habitat.[1] The government requested an expedited consideration of its motion. Arkansas Game responded on October 23, 2006, opposing the government's motion, and this court held a telephonic hearing on the motion on October 24, 2006. At the conclusion of the hearing, this court granted the government's motion to compel, attached certain conditions to its grant of the motion, and provided a brief explanation of its reasoning. This opinion provides a more detailed explication of the court's reasons for granting the government's motion.

**BACKGROUND**

A. *Arkansas Game's Claims*

In 1938, Congress passed the Flood Control Act of 1938, Pub. L. No. 75-761, 52 Stat. 1215, 1218, approving plans and projects to control flooding in several regions of the country, including the White River Basin in Missouri and Arkansas. Compl. at 3. The Act authorized the construction of Clearwater Lake and Clearwater Dam on the Black River, a tributary of the White River that runs through southeastern Missouri and northeastern Arkansas. *See* 52 Stat. at 1218; Compl. at 3; Arkansas Game & Fish Comm'n, *Clearwater Lake/Black River Water Control Plan Issue Brief* at 1 (Feb. 27, 2002), *available at* http://www.agcf.com/pdf/issue_briefs/Clearwater-Black%20River.pdf. Clearwater Dam, located about 32 miles northwest of Poplar Bluff, Missouri, regulates the flow of the Black River and reduces flooding of nearby agricultural lands. Compl. at 3.

---

[1] A piezometer is an instrument used to measure the local static pressure of a moving fluid, such as water. The pressure is measured by a pressure gauge that is connected to an opening in the piezometer. The pressure that a moving fluid exerts on the opening is equal to the local static pressure of the fluid at the opening. *See Chemical Engineers' Handbook* 396 (John H. Perry, 3d ed., 1950).

Downstream from the Clearwater Lake and Dam lies the Black River Management Area, a 25,000-acre tract that spans parts of Clay, Randolph, and Green counties in northeastern Arkansas and is owned by Arkansas Game. Compl. at 2. Arkansas Game purchased the bulk of the lands that constitute the Black River Management Area in the 1950s and 1960s to preserve bottomland hardwood habitat and to provide wintering habitat for thousands of migratory waterfowl. *Id*. at 2.

Clearwater Lake is governed by a water control plan set forth in the Clearwater Lake Water Control Manual ("Clearwater Lake Manual" or "Manual"), which was originally published in 1953 and revised in 1995. Compl. at 3; Answer at 2-4. The Manual states that releases of lake water, coupled with uncontrolled flows entering the Black River from tributaries below the Clearwater Dam, must not exceed a stage of 11.5 feet from December 1 to March 31 or a stage of 10.5 feet from April 1 to November 30, as measured by a central gauging station at Poplar Bluff. *See* Compl. at 4; Answer at 3-4. The growing season for the bottomland hardwood trees basically extends from April through November. Compl. at 4. Arkansas Game alleges that from 1993 to 2000 the Corps intentionally deviated from the water control plan in violation of regulatory and statutory requirements, including 33 C.F.R. § 222.5(f), (g), and the National Environmental Policy Act of 1969, Pub. L. No. 91-190, 83 Stat. 852 (codified, as amended, at 42 U.S.C. §§ 4321-4370f). Compl. at 4-5.

Arkansas Game avers that prior to 1993, the Corps's controlled releases from Clearwater Lake allowed the water in the Black River Management Area to recede by late-May, but that the Corps's subsequent deviations from the water control plan – greater releases of lake water from mid-May through November – allowed flooding to extend until mid-to-late August, well into the growing season of the bottomland hardwood trees. Compl. at 4-5. Arkansas Game contends that much of the soil on the Black River Management Area remained saturated for ten or eleven months of the year, leading to dramatically higher mortality rates among oak trees and the emergence of adverse symptoms in other living trees that indicated premature mortality. *Id*. at 5, 7. Arkansas Game seeks compensation for the damage to timber within the Black River Management Area and for the costs of restoring and revitalizing the soil necessary to sustain the type of bottomland timber allegedly taken by the Corps's actions. *Id*. at 7-9. The government denies that the Corps deviated from the water control plan and that the Corps's water-release practices at Clearwater Lake caused the timber damage that Arkansas Game alleges. Answer at 5, 7.

B. *The Government's Motion to Compel*

On September 22, 2006, the government requested by telephone that Arkansas Game permit the government to install seven to ten water-level piezometers in the Black River Management Area. Def.'s Motion to Compel Testing and Measuring on the Dave Donaldson-Black River Wildlife Management Area and Request for Expedited Review ("Def.'s Mot. to Compel") at 1; Hr'g Tr. 32:19 to 33:11 (Oct. 24, 2006). The government later put this request in writing in a letter to Arkansas Game's counsel, dated September 25, 2006. Def.'s Mot. to

Compel at 1-2 & Ex. A (Letter from HelenAnne Listerman to Julie Greathouse (Sept. 25, 2006)). On October 5, 2006, Arkansas Game's counsel refused the government's request, stating that the installation of the piezometers would constitute fact discovery and that fact discovery had ended on October 2, 2006. Def.'s Mot. to Compel at 2 & Ex. B (Letter from Greathouse to Listerman (Oct. 5, 2006)). The government subsequently reiterated its request by serving a formal notice on Arkansas Game on October 11, 2006, pursuant to Rule 34(a)(2) of the Rules of the Court of Federal Claims ("RCFC"). Def.'s Mot. to Compel at 2. The government's notice requested a response within two days, but Arkansas Game did not respond. *Id*. at 2; Pl.'s Resp. to Def.'s Mot. ("Pl.'s Resp.") at 3.

On October 17, 2006, the government filed its motion to compel under RCFC 34(a)(2) and indicated that it had in good faith conferred with Arkansas Game to gain access to the Black River Management Area. *See* Def.'s Mot. to Compel at 2. The government's motion states that the piezometers would be used to "test and measure conditions during winter flooding, which . . . [begins in] October" and that the piezometers would be removed sometime between February and April 2007. *Id*. In support, the government asserts that the piezometers would "yield useful results," allowing the government's experts to correlate water-level data they gather from the piezometers with river-stage data gathered by the Corps during the period of the alleged taking. *Id*.; Hr'g Tr. 14:1 to 15:9 (Oct. 24, 2006). The government also claims that its request constitutes "expert discovery" and thus is not affected by the expiration of the time for fact discovery. Def.'s Mot. to Compel at 3.

Arkansas Game opposes the government's motion to compel on three grounds. First, Arkansas Game claims that the government's proposed installation of the piezometers constitutes fact discovery under the provision in Rule 34(a)(2) for requests for entry upon the land for inspection, testing, and sampling, and it points out that fact discovery closed on October 2, 2006. Pl.'s Resp. at 4. Arkansas Game argues that the government had ample time to make its request before the close of fact discovery because the government has long been aware of the Black River Management Area's winter flooding season, and the government's experts previously visited the Black River Management Area in October 2005, February 2006, and July 2006. *Id*. at 5-7. Second, Arkansas Game argues that the information the government seeks is not material because Arkansas Game's allegations concern conduct in the 1990s through 2000, but the government is seeking data from 2006 and 2007. *Id*. at 8. Finally, Arkansas Game avers that the request will cause undue delay in the resolution of this case, more than likely requiring that trial be deferred until 2008. *See id*.

## ANALYSIS

A. *Fact Discovery v. Expert Discovery*

The government contends that its request under RCFC 34(a)(2) to install seven to ten piezometers in the Black River Management Area constitutes expert discovery. Def.'s Mot. to Compel at 1, 3-5; Hr'g Tr. 8:23-25 (Oct. 24, 2006). RCFC 34(a)(2), however, contemplates

entry upon land to gather facts.  The rule is identical to its counterpart in the Federal Rules of Civil Procedure, and states:

> Any party may serve on any other party a request . . . (2) to permit entry upon designated land or other property in the possession or control of the party upon whom the request is served *for the purpose of inspection and measuring*, . . . *testing, or sampling the property* or any designated object or operation thereon, within the scope of RCFC 26(b).

RCFC 34(a) (emphasis added).  The earlier, initial subdivision of the rule, RCFC 34(a)(1), relates to garden-variety document production requests and requests to "inspect and copy, test, or sample any other tangible things . . . in the possession, custody or control of the party upon which the request is served."  By contrast, RCFC 34(a)(2) concerns discovery requests that generally cannot be satisfied by merely transmitting materials and that require an entry upon land for inspection or testing on the opposing party's property.  Both types of discovery requests in RCFC 34(a) deal with the gathering of facts, not expert discovery.

The fact discovery addressed by RCFC 34(a) differs from the expert discovery covered by RCFC 26, which provides that expert discovery will be carried out through mandatory disclosure of the reports of experts expected to testify at trial, and through interrogatories or depositions.  *See* RCFC 26(a)(2)(B), (b)(4)(A)-(B).[2]  This court's Case Management Procedures also differentiate fact discovery from "the disclosure of any experts' reports, and . . . depositions or other discovery of experts."  RCFC, App. A, ¶ 5.

In this case, the government's experts might ultimately render opinions based on the data obtained from the piezometers, and those opinions would be subject to the rules relating to expert discovery.  *See* RCFC 26(a)(2)(B), (b)(4)(A)-(B).  The unevaluated data from the piezometers, however, would not be expert "opinions to be expressed and the basis and reasons therefor," RCFC 26(a)(2)(B), even though the results of testing by the piezometers might well become "data or other information considered by the [expert] in forming the opinions," *id*., or "facts known . . . by an expert."  RCFC 26(b)(4)(B).

The interaction of fact and expert discovery also has a variety of consequences for development of a case for trial.  For example, apart from mandatory disclosure of opinions held

---

[2] The scope of permissible inspections under Fed. R. Civ. P. 34(a)(2) is governed by Fed. R. Civ. P. 26(b).  Wright and Miller note that these rules allow the inspection of any "document or thing that is relevant to the subject matter involved in a pending action . . . unless . . . it reveals facts known and opinions held by experts," suggesting that expert discovery does not fall under Fed. R. Civ. P. 34(a)(2) or its counterpart RCFC 34(a)(2).  8A C. Wright, A. Miller & R. Marcus, *Federal Practice & Procedure* § 2206 at 379 (2d ed. 1994).  *See Biben v. Card*, 119 F.R.D. 421, 425 (W.D. Mo. 1987) (citing 8 C. Wright and A. Miller, *Federal Practice & Procedure* § 2206 (1970)).

by testifying experts, discovery of experts is subject to limitations not attendant to fact discovery. For example, in *Eirhart v. Libby-Owens-Ford Co.,* 93 F.R.D. 370 (N.D. Ill. 1981), the defendant claimed that plaintiffs' request under Fed. R. Civ. P. 34(a)(2) to observe an experimental production line developed by the defendant's experts was forbidden by Fed. R. Civ. P. 26(b)(4)(B), which strictly limits the discovery of "facts known and opinions held" by experts *not* expected to testify at trial. *Eirhart,* 93 F.R.D. at 371-72; *see* Fed. R. Civ. P. 26(b)(4)(B). Nonetheless, of significance for the dispute in this case, the district court rejected the defendant's argument, observing that "[i]f [the defendant's] experts are indeed involved in the test . . . , plaintiffs are not calling for their 'opinions held'– [*i.e.*,] their conclusions from the test results. Instead plaintiffs ask only to observe the test as it is being conducted." *Eirhart,* 93 F.R.D. at 371-72. Similarly, the government's experts in this case do not yet know the "facts" that the piezometers will reveal and cannot develop "opinions" concerning the data until they have actually analyzed and evaluated those data. *See id.; see also Shell Petroleum, Inc. v. United States*, 46 Fed. Cl. 583, 586 (2000) ("The discovery requests [about aspects of oil production from 'credit wells'] . . . seek 'factual,' – not 'opinion' and not 'expert' – information.").

That the government's measuring or testing of piezometers at the Black River Management Area might involve experts does not transform the fact-related request under RCFC 34(a)(2) into expert discovery. Site inspections under RCFC 34(a)(2) and Fed. R. Civ. P. 34(a)(2) can readily involve experts because their knowledge and skills are at times required to render the inspection fruitful for the inspecting party. *See McKesson Corp. v. Islamic Republic of Iran,* 185 F.R.D. 70, 72, 75 (D.D.C. 1999) (permitting plaintiff's expert to inspect the defendant's "facilities, equipment, and machinery"); *Chemical Bank v. First Chicago Bank of Ravenswood*, 1993 WL 524715, *1 (N.D. Ill. 1993) (permitting plaintiff's general contractor and subcontractors to conduct "environmental inspecting and measuring, surveying, photographing, testing or sampling" of defendant's premises); *New York State Ass'n for Retarded Children v. Carey,* 706 F.2d 956, 960-62 (2d Cir. 1983) (upholding a district court's order permitting plaintiffs' consultants and experts to inspect the defendants' facilities to "take photographs, make observations, take notes, form conclusions"); *Eirhart,* 93 F.R.D. at 371-72 (granting plaintiffs' consultants access to the defendant's plant to observe an experimental production line).

In support of its argument that the requested installation of the piezometers constitutes expert discovery, the government cites *Cook v. Rockwell Int'l Corp.*, 147 F.R.D. 237 (D. Colo. 1993), a toxic-tort suit filed by plaintiffs who lived or possessed property interests near the Rocky Flats weapons production facility in Colorado. Def.'s Mot. to Compel at 4; *Cook*, 147 F.R.D. at 239-40. The government asserts that *Cook* involved the issuance of an "Expert Discovery Order" that "allowed soil, air, and water testing as part of expert discovery." Hr'g Tr. 8:3-10 (Oct. 24, 2006); *see also* Def.'s Mot. to Compel at 4. In fact, however, as the district court explained, the magistrate judge's "Expert Discovery Order" was not an order granting the plaintiffs a right to conduct certain tests, but rather was a denial of the plaintiffs' motion for an enlargement of the deadline for expert discovery *because* "'[t]he plaintiffs [had] had nearly two years to obtain their own soil, air, and water tests.'" *Cook*, 147 F.R.D. at 242 (quoting the magistrate judge's decision). The district court in *Cook* actually ruled that an enlargement of

time for plaintiffs to submit their expert reports was appropriate, contrary to the magistrate judge's decision being reviewed, because plaintiffs had not "had a fair opportunity to identify, procure and digest any relevant documents produced through . . . further discovery." *Id*. at 245. Furthermore, the "soil, air, and water tests" to which the magistrate judge had referred related to testing of the plaintiffs' properties and their bodies for toxic contaminants, not to testing conducted on the defendants' premises or at Rocky Flats. *See id*. at 244.  The additional documentary discovery considered relevant by the district judge concerned "quantities of material consumed at Rocky Flats, epidemiological studies [,] and monitored emissions . . . [which could be] used to model [p]laintiffs' likely exposure to contaminants which can no longer be measured directly." *Id*. *Cook*, accordingly, does not support the government's contention.

In sum, the government's argument that its request under RCFC 34(a)(2) to install seven to ten piezometers in the Black River Management Area constitutes expert discovery cannot be accepted.  As the plain language of RCFC 34(a)(2) taken in context with that of RCFC 26(a)-(b) shows, an entry upon the property of another party for testing and sampling manifestly constitutes fact discovery.  Consequently, this court shall deem that defendant's motion to compel also includes a request for an enlargement of fact discovery under RCFC 6(b), RCFC 16(b)(3), and RCFC 34.[3]

B. *Application of the Standards Governing a Belated Request for Testing on Land*

The government's belated request to install piezometers in the Black River Management Area must be supported by good cause, both as to timeliness and as to necessity. *See Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 894-97 & n.5 (1990) (addressing good cause as to time, applying Fed. R. Civ. P. 6(b)); *Maldonado-Denis v. Castillo-Rodriguez*, 23 F.3d 576, 583-84 (1st Cir. 1994) (addressing good cause as to time, applying Fed. R. Civ. P. 6(b)); *Smith v. ICI Ams., Inc.*, 145 F.R.D. 45, 47-48 (D. Del. 1992) (considering the "good cause" and "excusable neglect" requirements of Fed. R. Civ. P. 6(b)(1) and (2) to be similar); 1 James Wm. Moore, *Moore's Federal Practice* § 606[4] at 6-49 (3d ed. 2006) (noting a more liberal interpretation of good cause for extensions of discovery requirements); *Belcher v. Bassett Furniture Indus.*, 588 F.2d 904, 908 (4th Cir. 1978) (emphasizing the showing of need required for inspection of land, applying Fed. R. Civ. P. 34).  Discovery matters under RCFC 34 lie within the court's discretion, *see Forest Prods. Nw., Inc. v. United States,* 453 F.3d 1355, 1359 (Fed. Cir. 2006) (noting that the Federal Circuit "review[s] discovery matters for an abuse of discretion"); 8A C. Wright, A.

---

[3]RCFC 6(b) establishes different requirements for an extension depending upon whether a request for enlargement is made before or after the expiration of the pertinent deadline.
> [T]he court for cause shown may at any time in its discretion (1) with or without motion or notice order the period enlarged if request therefor is made before the expiration of the period originally prescribed or as extended by a previous order, or (2) upon motion made after the expiration of the specified period permit the act to be done where the failure to act was the result of excusable neglect.

7

Miller & R. Marcus, *Federal Practice & Procedure* § 2215 (2d ed. 1994) at 444-45 (citing *United States v. Kohler Co.,* 9 F.R.D. 289, 291 (E.D. Pa. 1949)).  RCFC 34 "authorizes the broadest sweep of access, inspection, examination, [and] testing" and should be broadly construed.  8A *Federal Practice & Procedure* § 2206 at 379; *see also id.* § 2202 at 357 ("[Fed. R. Civ. P. 34] is to be liberally, rather than narrowly, construed.").  Although a request under RCFC 34(a)(2) for entry onto another party's property to conduct testing calls for a more searching inquiry into the necessity of the testing, *see Belcher*, 588 F.2d at 908; *Martin v. Reynolds Metals Corp.*, 297 F.2d 49, 56-57 (9th Cir. 1961) (Duniway, J.), the burden remains on the objecting party to convince the court that the testing is unnecessary.  *See* 8A *Federal Practice & Procedure* § 2214 at 435 (commenting on Fed. R. Civ. P. 34).

     RCFC 34(a)(2) provides that a request for an inspection of another party's property for the purpose of "measuring, . . . testing, or sampling" must fall "within the scope of RCFC 26(b)."  Under RCFC 26(b):

> (1) **In General**.  Parties may obtain discovery regarding any matter, not privileged that is relevant to the claim or defense of any party. . . .
> (2) **Limitations**. . . . The . . . extent of use of the discovery methods otherwise permitted under these rules shall be limited by the court if it determines that: (i) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity by discovery in the action to obtain the information sought; or (iii) the burden or expense of the proposed discovery outweighs its likely benefit.

RCFC 26(b)(1)-(2); *see also Micro Motion, Inc. v. Kane Steel Co.*, 894 F.2d 1318, 1323 (Fed. Cir. 1990) (citing Fed. R. Civ. P. 26(b)(1)).

     The government contends that installing the piezometers would provide data useful in determining causation in this case – namely, whether the Corps's actions caused the mortality and damage to bottomland hardwood trees that Arkansas Game alleges.  *See* Hr'g Tr. 6:12-15, 13:2-9 (Oct. 24, 2006). The government states that its experts will be able to correlate data gathered from the piezometers with river-stage data from staff gauges in place along the Black River, taking account also of data from the river-level gauges collected during the 1990s.  Hr'g Tr. 14:1 to 15:9 (Oct. 24, 2006).  Arkansas Game counters that testing during the winter flooding season at the Black River Management Area during 2006-2007 cannot be relevant to Arkansas Game's claims of timber damage and mortality that occurred during the growing season from 1993 to 2000.  Pl.'s Resp. at 8.

     Given the broad sweep of RCFC 26(b), the government has the better part of this argument.  The data gathered from the piezometers would be "relevant to the claim or defense of any party."  RCFC 26(b)(1).  Arkansas Game is correct that its allegations relate to the alleged

effects of the Corps's actions during the growing seasons from 1993 to 2000, and its chief allegation is that during that period the Corps's releases from Lake Clearwater from mid-May through November caused the water in the Black River Management Area not to recede until mid-to-late August, well into the growing season of the bottomland hardwood trees.  Compl. at 4-5.  However, the data the government seeks to gather from the piezometers would show the extent of flooding during the winter season, which begins in October of each year, how long it takes the water to recede after the flooding releases are curtailed, and how long the soil remains saturated after flooding ceases.  Hr'g Tr. 14:14 to 15:16, 32:19 to 33:2 (Oct. 24, 2006).  Even though data acquired during winter and spring events in 2006-2007 may not be directly pertinent to summer flow, evaporation, and transpiration conditions, the winter-spring data might provide a baseline for further analysis.  Given that the government contends that its experts can draw meaningful correlations between data gathered from the piezometers and river-gauge data the Corps would collect concurrently and had collected during the period of the alleged taking, Hr'g Tr. 14:1 to 15:9 (Oct. 24, 2006), the government's request to install the piezometers meets the relevancy test of RCFC 26(b).

The remaining questions are whether the government's request is unreasonably duplicative or is obtainable from a more convenient source, whether the government's request and motion are timely, whether the government has had ample opportunity to obtain the information, and whether the burden or expense of the request outweighs its likely benefit.  *See* RCFC 26(b)(2).  The government's request does not appear to be duplicative.  Although Arkansas Game avers that it already has collected data from gauges placed in the Black River Management Area in 1994 and 1995, Hr'g Tr. 27:3-20 (Oct. 24, 2006), the government contends that Arkansas Game used gauges placed at one point within the Management Area, while the government proposes to place piezometers at various points within the Management Area for the purpose of correlating the new data from gauges the Corps has had in place along the Black River.  Hr'g Tr. 12:16 to 13:1 (Oct. 24, 2006).  The difference between the 1994-1995 measurements at one location and those the government now seeks at multiple locations is enough to satisfy this court that the government's request is not duplicative.

A stronger argument in Arkansas Game's favor relates to the timeliness of the government's request.  Arkansas Game contends that the government had an opportunity to make its request in October of 2005, at the beginning of last year's winter flooding season.  Discovery in this case effectively began on September 21, 2005, when the court acted to dismiss that part of plaintiff's complaint that addressed injunctive relief and to establish a schedule for completion of fact discovery.  *See* Order of Sept. 21, 2005.  At that point, the government was well aware of the timing of the Black River Management Area's flooding season.  Thereafter, the government's experts visited the Black River Management Area on three occasions.  Pl.'s Resp. at 6-7.  Despite these repeated visits, the government's formal notice for entry on land under RCFC 34 to install the piezometers was not submitted until October 11, 2006, nine days after the close of fact discovery on October 2, 2006.  *Id*. at 3.  Nonetheless, two factors somewhat mitigate these circumstances.  First, the government's experts apparently first visited the Black River Management Area near the end of October 2005, shortly after they had been retained.  Def.'s

Mot. to Compel at 2. Winter flooding then would have been about to commence. At that time the government represents that its experts "had not determined *conclusively* that this testing [with piezometers] would be beneficial." *Id*. (emphasis added). As a cautionary note, however, the government's careful use of the limiting adverb "conclusively" suggests that the government's experts at least considered installing piezometers roughly a year ago. Second, the government's initial informal request, although insufficient to constitute an actual request under RCFC 34(a)(2), was made on September 22, 2006, before the close of fact discovery, and the formal request in compliance with the rule came only nine days after the close of fact discovery. Def.'s Mot. to Compel at 1-2. Thus, the government's tardiness in presenting its request is troublesome but not fatal.

In considering whether the government's request to enter and conduct testing on Arkansas Game's land places an undue burden on Arkansas Game, "the degree to which the proposed inspection will aid in the search for truth must be balanced against the burdens and dangers created by the inspection." *Belcher,* 588 F.2d at 908; *see also New York State Ass'n for Retarded Children,* 706 F.2d at 960; *Martin*, 297 F.2d 57; *McKesson Corp.,* 185 F.R.D. at 76. Although any entry upon a party's property places some burden on the landowner, *see infra*, at 11, and the inspecting party may be required to compensate the property owner for any damage or loss attributable to the inspection, *Martin*, 297 F.2d at 57, Arkansas Game does not press this issue. Rather, Arkansas Game points to the burden of delay that granting the government's request would cause, averring that the trial in this case probably would be delayed until 2008. *See* Pl.'s Resp. at 8. There is no question that installing the piezometers, gathering the data they collect, and analyzing the data will cause a delay amounting to six months or more. Such a delay virtually precludes proceeding to trial in 2007, given that expert work and discovery would not begin until after the data from the piezometers was in hand. The resulting delay undoubtedly imposes a burden on Arkansas Game, which filed its original complaint in this matter in March 2005. Nonetheless, at the crux of this case are issues of causation – whether the Corps's actions actually caused the alleged mortality and damage to the bottomland hardwood trees in the Black River Management Area – and the relevance of the piezometer data to causation outweighs the delay that will be realized upon granting the government's request.

Accordingly, although the government's request under RCFC 34(a)(2) is untimely to some extent, Arkansas Game has not demonstrated that the testing requested is unwarranted or that the resulting delay will be unduly burdensome. *See* 8A *Federal Practice & Procedure* § 2214 at 435 (addressing Fed. R. Civ. P. 34). As a result, the government's motion to compel under RCFC 37(a) to compel Arkansas Game to permit the government's experts to install seven to ten piezometers in the Black River Management Area is granted, subject to the conditions set forth below.

C. *Limitations on the Requested Sampling and Testing*

Decisions regarding entry on land for inspection or testing under RCFC 34(a)(2) are subject to the sound, not absolute, discretion of the court. *See Forest Prods.*, 453 F.3d at 1359;

*Belcher*, 588 F.2d at 907 (reversing a trial court's grant of inspection); *Martin*, 297 F.2d at 57 (affirming a trial court's limited and conditioned grant of inspection); 8A *Federal Practice & Procedure* § 2215 at 444-45.  "[T]he court may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." RCFC 26(c); *see* 8A *Federal Practice & Procedure* § 2214 at 440 (the court "may allow the inspection on specified terms and conditions").  Particularly where entry on land is concerned, the court should exercise care in framing an order to compel so as to cause as little inconvenience as possible.  *See Belcher*, 588 F.2d at 911 (emphasizing "the necessity of precision and care in the formulation of inspection orders").  In this instance, the installation of piezometers will not be unduly intrusive or burdensome because the piezometers themselves will occupy a *de minimis* part of the Management Area, the public generally is not precluded from access to the area, the piezometers should not interfere in any way with the hunting and other wildfowl management activities that take place in the Management Area, and, after removal, the piezometers should not have affected the Area in any way.

Applying these principles and considerations, the court has attached limitations on the order to compel Arkansas Game to permit the installation of the seven to ten piezometers on the Black River Management Area: (1) Arkansas Game shall have permitted the government's experts to install the piezometers on or before November 10, 2006, *see* Hr'g Tr. 41:12-13 (Oct. 24, 2006); (2) the government shall have provided advance notice to Arkansas Game of the installation of the piezometers and shall have permitted Arkansas Game's representatives or experts to accompany the government's agents or experts as they installed these instruments, *id*. at 41:15-21; (3) the government shall promptly provide to Arkansas Game any data retrieved from the piezometers, *id*. at 40:1-4; (4) the piezometers shall remain in place throughout the summer of 2007, rather than be removed in early 2007, *id*. at 40:10-18; (5) if and as necessary or desirable to retrieve data, loggers or other components of the piezometers may be temporarily removed, but if so removed for interim retrieval of data, the loggers or components must be promptly replaced to continue collection of data until the end of the period specified in condition (4) above; (6) the government shall provide advance notice to Arkansas Game of any occasion on which the government's agents take readings from the piezometers or otherwise retrieve data from them, and shall provide Arkansas Game's representatives an opportunity to accompany the government's agents or experts on such occasions; (7) each piezometer shall include a Global Positioning Satellite placement designation, *id*. at 43:13-19; (8) the government shall provide a map to plaintiff and the court detailing the locations of the piezometers, *id*. at 44:1-10; (9) the piezometers shall be fully and completely removed from the Management Area when the program of testing and sampling has been completed; and (10) the government shall compensate Arkansas Game for any damage or loss attributable to the installation of the piezometers, retrieval of data from them, or removal of the piezometers when the testing and sampling has been concluded.

**CONCLUSION**

For the reasons set forth, the government's motion under RCFC 37(a) to compel Arkansas Game to permit the installation of seven to ten piezometers in the Black River Management Area is GRANTED, subject to the conditions and limitations specified in this opinion. The time for completion of fact discovery is extended to May 31, 2007. The parties shall file a further joint status report on or before June 12, 2007, proposing a schedule for further proceedings in this case. No costs.

It is so ORDERED.

                                            s/ Charles F. Lettow
                                            Charles F. Lettow
                                            Judge